### UNITED CHROMIUM, Inc., v. INTERNATIONAL SILVER CO.
No. 1994.

District Court, D. Connecticut.
Oct. 20, 1931.

Livingston Gifford, Gustave R. Thompson, and Newton A. Burgess, all of New York City, for plaintiff.

W. B. Morton and E. H. Merchant, both of New York City, for defendant.

THOMAS, District Judge.

This is a bill in equity which charges the defendant with infringement of letters patent No. 1,581,188, issued to Colin G. Fink on April 20, 1926, on an application filed December 19, 1925. By various mesne assignments title to the patent in suit now rests in the plaintiff corporation.

The defense in this case has been conducted by Weisberg and Greenwald, chemists of New York City, who designed and installed the plating plant for the International Silver Company in Meriden, in this district. So far as appears in this record, the International Silver Company never did anything more than employ Weisberg and Greenwald to equip its plant with a chromium plating outfit and start the operation of it. The jurisdiction of this court is therefore invoked because of the facts just set forth which show that Weisberg and Greenwald of New York City are the real defendants and the International Silver Company is the nominal defendant using the product of the New York chemists.

On June 20, 1928, and before this suit was brought, Fink filed a disclaimer limiting claims 1, 2, 4, 5, 6, 10, 11, 12, 13, and 15, as will hereinafter appear when the disclaimer is under discussion.

The claims in suit, in addition to those limited by the disclaimer, are 3, 16, and 18. Claims 7, 8, 9, 14, and 17 are not in issue.

The invention described and claimed in the patent in suit relates to electroplating, and more particularly to a process of electro-depositing chromium from solutions of chromic acid.

The invention claimed by the patentee is, as admitted in the patent, only an improvement in the art of chromium plating, as the literature on the subject dates back many years. Professor Fink had made a deep study of the subject-matter over a period

of years, and was familiar with the history of the art, and in the specification said: "For merely a century there has appeared in the literature considerable matter in respect to chromium plating, and in that literature the use of chromic acid as an electrolyte, as well as the use of various so-called addition agents has been proposed. Notwithstanding these disclosures, a practical and commercially available process of electroplating chromium has not heretofore been known, nor have any of the attempts to establish the commercial art of electro-depositing chromium ever satisfied the test of actual commercial requirements. What attempts have been made have always given uncertain and unreliable results and have resulted in ultimate failure as a reliable or satisfactory commercial process."

Professor Fink then continues to describe the invention, and it can be no better stated than in the specification where he says:

"I pass an electric current (from an anode to a cathode, the latter serving as the object on which the metal is to be deposited) through a suitable chromium-carrying electrolyte solution, in the presence of a catalyst. The catalyst is, as usual, a bystander which does not enter into the electro-chemical decomposition. The chromium-carrying electrolyte which I have found suitable for my process, is a solution of chromic acid, its degree of concentration as regards baths of commercial interest ranging from about 150 grams per litre to saturation.

"The catalytic agent which I use is one having an acid radical which is stable in the bath and which remains stable under the actions which occur in the process when the current is passed through the bath. This catalytic agent is one which performs its action at the cathode."

Among the acid radicals proposed by the patentee is an acid having a sulphate radical which is represented by the chemical symbol $SO_4$. The S stands for sulphur, the O for oxygen, and so the $SO_4$ is the sulphate radical which is the catalyst of the patent.

The inventor discloses and emphasizes five rules essential to a continuous and commercial operation, and asserts that these rules transformed the art of small and impractical laboratory experiments to what he had been for some years seeking, viz., a continuous, practical, and commercially successful chromium plating process. These rules are carefully set forth in the specification, and are as follows:

(1) In preparing the electrolyte all of the stable radicals (e. g. $SO_4$) must be computed whether originally in the chromic acid, in the catalytic agent, or otherwise entering the bath.

(2) The amount of stable radicals (catalytic agent) in the bath should approximate 2.5 grams—be 5 grams of sulphate radical per liter of a solution containing 250 grams per liter of chromic acid.

(3) The quantity of the catalytic agent should be regulated within said limits for continuous operation.

(4) By adding to or subtracting from the quantity of catalytic agent (stable radicals) already present in the chromic acid solution the necessary amount to bring the total amount up to or down to the given limits.

(5) For temperatures of 15°C to 40°C the proper film is obtained with current densities from $\frac{1}{4}$ to 1 ampere per square inch. The specification then concludes, and asserts, in effect, that, if these rules are observed, there will result a practical, reliable, and commercially available and successful process for electrodepositing chromium from chromic acid solutions and a reliable and commercially adaptable method of preparing the chromic acid electrolyte. The evidence shows that these rules were original with Professor Fink, and were only discovered by him after years of research and laboratory experiment in the laboratory at Columbia University, where he was and is professor in chemical engineering and head of the Department of Electro-Chemistry. He asserts, and I find from the evidence, that, when these rules are followed, commercial success—as distinguished from mere laboratory experiments which at times are successful as well as unsuccessful—a practical and continuous electrolyte is assured. Without an adherence to these rules, no process can be commercially successful. But the importance of the correct solution dominates the whole theory of successful chromium plating for commercial purposes.

It is alleged by the plaintiff that, prior to the invention described and claimed in the patent in suit (which consists in the simultaneous application of the five rules above set forth, some of which are not new per se), chromium plating was limited to a practice in laboratories, and was a failure when carried beyond the laboratory limits. All through the specification the patentee emphasizes the importance of commercial success, and the evidence shows that the commercial success was the result accomplished by simultaneous application of the rules mentioned, supra. The evidence adduced clearly establishes the fact that, notwithstanding all the experiments which had been made by many highly trained scientists through a period of nearly a century, no satisfactory commercial process of chromium plating was found prior to the discovery by the patentee of the five rules enumerated. Today chromium plating seems common-place, as we find it on all automobile hardware, whether on the cheapest or highest priced cars. It is generally applied to-day on all bath room and plumbing fixtures, on so-called silver sets and silverware, on many articles of cheap jewelry, as well as on many other articles of manufacture and which are in general use. Chromium is a very hard metal, and resists rust and wear better than any other, and is not liable to chip or crack or peel as is the case with nickel plating. Besides, it requires no especial care, and always keeps bright without continual polishing. It has many advantages over any of the other metals used in plating before 1927. Prior to Fink there was no really practical, satisfactory, successful, and commercial chromium plate. The commercial success of Professor Fink's method consists, not only in producing chromium-plated articles of every kind and description which meets in all fields the requirements of the trade and the public in general, but also because the plating process is made continuous, which obviates waste in the electrolyte in the steady plating operation day in and day out. Both of these features were unknown prior to the patentee's invention. The plating on certain pieces of metal was, at times, nearly a success, and often it was partly a failure, and frequently a complete failure. The electrolyte had to be renewed after each run or after several runs, that is, after each or after several plating operations, and so could not be carried over and used day after day. The patentee discovered that for commercial plating the fundamental and essential thing was to regulate the concentration of the catalyst acid radical ($SO_4$) at the start, and always, so as to secure and maintain the ratio of the chromic acid and catalyst acid radical $\frac{CrO_3}{SO_4}$ within definite limits and preferably at $\frac{100}{1}$. Although expressed as a single thing, the essential thing is really three things in one, and these three ideas disclosed in the Fink patent in suit are as follows:

I. Knowledge that the catalyst acid radical is the activator of a chromic acid bath, converting it into a chromium plating bath, and is therefore the specific thing to regulate.

II. Adjustment of the concentration of the $SO_4$ radical, so as to secure a starting bath within definite limits of the ratio $\frac{CrO_3}{SO_4}$, and, preferably at one hundred to one.

III. Regulation of the concentration of the $SO_4$ radical within the given limits of the ratio $\frac{CrO_3}{SO_4}$ for continuous operation.

The first and second point secure a proper starting bath, and point 3 secures a continuation of the process.

The prior publications and prior patents relied on by defendant do not teach the patentee's invention. On the contrary, they emphasize the fact that Fink's "regulation" is one of the missing links in all prior chromium-plating efforts. Defendant attempts to supply this link from other metal plating arts. But, inasmuch as a chemical action is involved here, analogy does not go a long way, because, while one can predict with confidence in mechanics in some instances, and in some cases where mathematics can be applied, in chemistry one almost entirely fails. In chemistry one cannot anticipate a result. A result may be obtained only by experiment.

Such is the established law. In Corona Co. v. Dovan Corp., 276 U. S. 358, on page 368, 48 S. Ct. 380, 383, 72 L. Ed. 610, Chief Justice Taft said: "The catalytic action of an accelerator cannot be forecast by its chemical composition, for such action is not understood and is not known except by actual test."

So, too, in Tyler v. Boston, 7 Wall. (74 U. S.) 327, on page 330, 19 L. Ed. 93, Mr. Justice Grier said: "Now a machine which consists of a combination of devices is the subject of invention, and its effects may be calculated a priori, while a discovery of a new substance by means of chemical combinations of known materials is empirical and discovered by experiment."

The Second Circuit Court of Appeals in General Electric Co. v. Laco-Philips Co., 233 F. 96, affirmed Judge Mayer, and adopted his opinion in so doing. Judge Mayer held that the expert in that case stated the rule in the following way (page 103 of 233 F.): "Chemistry is essentially an experimental science, and chemical provision is as impossible to-day, in spite of the accumulation of the great knowledge, as it was in former times."

See, also, Naylor v. Alsop Process Co. (C. C. A.) 168 F. 911; Stevens v. Keating, 2 Web. 181; Toledo Rex Spray Co. v. California Spray Chemical Co. (C. C. A.) 268 F. 201.

Professor Fink discovered a latent difficulty, and he located that difficulty only after repeated experiments and failures. When the difficulty had been definitely determined and located, he then had to hunt for the remedy. After continually experimenting, he finally found the remedy, and he is therefore entitled to the fruits of his labors. We have here a situation similar to one which was before the Circuit Court of Appeals for the Third Circuit in Consolidated Window Glass Co. v. Window Glass Machine Co., 261 F. 362, and Judge Buffington, speaking for that court, used language especially apposite here. On page 373 of 261 F. he said: "It is to be noted that the inventions made involve, * * * the unusual feature of first locating or discovering the difficulty to be overcome and its relation to the whole problem, before any inventive steps were taken to solve it. In other words, these patents involve, so to speak, two series of inventions: First, discovering the difficulty; and, second, discovering means to overcome that difficulty."

Patentable novelty is some times found in discovering what is the difficulty with an existing structure and what change in its elements will correct the difficulty, even though the means for introducing that element into the combination are old and their adaptation for the purpose involves no patentable novelty. Michle Printing Press & M. Co. v. Whitlock Printing Press & Mfg. Co. (C. C. A.) 223 F. 647. Professor Fink first discovered the root of the difficulty, and then discovered the remedy. The root of the difficulty was the variation in ratio of $CrO_3$ to $SO_4$, and the remedy was the adjustment and regulation of that ratio within the limits specified in the patent in suit.

The published experiments of Carveth and Curry as well as those of Sargent and Schwartz, on which the defendant relies, were those carried on in the laboratory and with only very small quantities of electrolytes. Their baths did not last beyond one operation, and only small pieces of metal were plated. They were noncontinuous, noncommercial laboratory experiments. These publications cannot be permitted to anticipate, because, inter alia, the proportion of $SO_4$ or other catalytic radicals contained in the chromic acid is not set forth. The documentary evidence as well as the oral testimony in this case is filled with accounts of speculations on this subject, and the lengthy discussions are veritable lectures of great in-

terest and all given by men of the highest standing in their profession as well as in this art. And these publications have been introduced in evidence by defendant, not only to minimize Fink's invention, but even to defeat it. Such efforts cannot succeed, and they ought not to succeed. I regard the situation here as somewhat analogous to the one set forth in American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103 and Judge Hough, speaking for the Circuit Court of Appeals for the Second Circuit, uses language quite applicable here. On page 105 of 290 F. he said:

"There are many inventions which seem to have been gathered, as it were, from the scrap heaps of human effort. They appear to observers as the results of accident, rather than intelligent design. But where men, doubtless well equipped for a particular sort of work, have hoped and investigated and even prophesied as to what could be done, but never did it, and other men similarly equipped have by intensive study and skillful experiment succeeded, such success commands and should receive a greater meed of intellectual appreciation than is accorded even to the cleverness of picking up and utilizing an unconsidered or discarded trifle. When to the scientific triumph of succeeding where other scientists have failed is added the development of a new branch of industry, the word 'pioneer' may well be accorded to the patent which describes and defines, even though lamely, the essentials of such success.

"Half a century ago Woods and Clark (British No. 1,923 of 1872) filed provisional specification for an 'improved alloy for anti-acid metal'; but they never completed their application. Of this abandoned disclosure defendant declares that these men 'taught the world * * * that high chromium ferrous alloys, consisting of low carbon Bessemer steel and high chromium content, with more or less tungsten,' could be used to produce stainless alloys, and it is urged that 'the patents in suit have added nothing to that knowledge.' On the contrary, our inference is that Woods and Clark must have thought little of their own concept, as they dropped the matter at once; while examination of their disclosure shows that their preferred alloy for 'anti-acid metal' was made in proportions wholly wrong, while their methods of production were merely impossible. They were perhaps among the prophets; but it requires more than prophecy of what may be done, or than declarations of what ought to be accomplished, to make a good patent reference, not to speak of an anticipation. It is necessary to show with reasonable certainty how the desired result can be accomplished. Westinghouse, etc., Co. v. Great Northern Co., 88 F. 258, 31 C. C. A. 525."

Consequently the publications in evidence cannot vitiate the letters patent subsequently issued to Fink. In Seymour v. Osborne, 11 Wall. (78 U. S.) 516, on page 555, 20 L. Ed. 33, Mr. Justice Clifford said: "Patented inventions cannot be superseded by the mere introduction of a foreign publication of the kind, though of prior date, unless the description and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent. Mere vague and general representations will not support such a defense, as the knowledge supposed to be derived from the publication must be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and to carry it into practical use. Whatever may be the particular circumstances under which the publication takes place, the account published, to be of any effect to support such a defense, must be an account of a complete and operative invention capable of being put into practical operation."

He also cited Webster's Patent Cases, p. 719, which reads: "If the invention be not described and published as a complete, perfected and successful invention, but be published as an account of some experiment or by way of suggestion and speculation as something which peradventure might succeed, it is not such an account as will vitiate subsequent letters patent."

See, also, Wood-Paper Patent, 23 Wall. (90 U. S.) 566, 23 L. Ed. 31; Union Carbide Co. v. American Carbide Co. (C. C. A.) 181 F. 104; Parke-Davis & Co. v. H. K. Mulford Co. (C. C.) 189 F. 95; Permutit Co. v. Wadham (C. C. A.) 13 F.(2d) 454; Naylor v. Alsop Process Co. (C. C. A.) 168 F. 911; United Nickel Co. v. California Electrical Works (C. C.) 25 F. 475; Tannage Patent Co. v. Donallan (C. C.) 93 F. 811, 815.

The evidence regarding commercial success is persuasive. It abundantly shows that over a long period of dreary years constant effort failed from a commercial point of view. After the advent of the patent in suit, it grew

from small proportions in 1926 until the year 1929 showed the receipt by the plaintiff of $486,159 from royalties alone paid by 202 licensees scattered all over the United States. So I conclude that, if commercial success ever counts in favor of patentability, it must count heavily here, because of the very fact that no one at any time prior to Fink had ever been able to electroplate chromium and make it a commercial success.

Plaintiff filed a disclaimer, disclaiming from claims 1, 2, 4, 11, and 12 any method of electrodepositing chromium in which regulating a radical component of the bath (other than or in addition to the chromic acid radical) is not practiced in maintaining the efficiency thereof; and from claims 5, 6, 10, 13, and 15 any method of electrodepositing chromium in which regulating within the limits specified a radical component of the bath (other than or in addition to the chromic acid radical) is not practiced in maintaining the efficiency thereof. No disclaimer was filed as to claims 3 and 18, which are relied upon. They contain words of limitation to being "maintained" or "regulated" in "continuous deposition." By the disclaimer, the claims are all limited to the step of maintaining the efficiency of the bath by regulating the radical component of the bath (other than or in addition to the chromic acid radical).

The defendant has offered proof of three alleged prior uses:

I. The Bureau of Standards and the Bureau of Printing and Engraving in Washington, D. C.

II. The Eastman Kodak Company, Rochester, N. Y.

III. The Westinghouse Electric & Manufacturing Company at East Pittsburgh, Pa., and at its lamp works in Bloomfield, N. J.

The Bureau of Standards did not practice the invention of the patent in suit prior to Fink. Only laboratory experiments were conducted by Eastman up to the time of Fink's date of invention, and prior use has not been proven in the Westinghouse works at East Pittsburgh or at Bloomfield.

In view of what has been said supra, all claims in suit are held valid and not inspired by the prior publications or by the prior art and not anticipated by the alleged prior uses.

Now we come to the question of infringement. Defendant's process is described step by step in the Stipulation marked Exhibit T, which is dated January 26, 1930. It is also described in defendant's answer to the interrogatory read into the record at page 42. De-fendant admits in its brief that it practices the invention described, for example, in claim 15 of the patent, and, in addition thereto, withdraws a sample of the solution at intervals of approximately thirty days and analyzes it. If any loss of sulphate radical is noted, it is made up by an additional amount supplied to the solution, thus keeping the percentage of sulphate radical substantially constant. This being the case, the defendant comes clearly within claim 15 as limited by the disclaimer filed June 20, 1928. The remaining claims in suit are similarly infringed. I therefore conclude that all claims in suit are valid and infringed by the defendant's process.

It follows, therefore, that there may be a decree for the plaintiff for an injunction, reference, and accounting.

Submit decree accordingly.