(C. D. 739)

ART E. WEISS CO. (INC.) v. UNITED STATES

United States Customs Court, First Division

(Decided February 25, 1943)

*Strauss & Hedges; Barnes, Richardson and Colburn* (*Joseph Schwartz* and *Samuel M. Richardson* of counsel), for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *John J. McDermott*, special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

WALKER, Judge: The merchandise involved in this suit against the United States consists of certain moleskin plates which were assessed for duty at the rate of 40 per centum ad valorem under the provision in paragraph 1519 (b) of the Tariff Act of 1930 for "manufactures of fur * * * including plates * * * if dyed." The claim in each case is that the merchandise is not dyed, and hence is entitled to classification under the same paragraph at the rate of 35 per centum ad valorem, as plates of fur, not dyed.

A sample of the plates involved was identified by the single witness called by the plaintiff, Joseph Weiss, who was the vice president of the plaintiff corporation, and it was received in evidence without objection as exhibit 1.

Plaintiff's witness testified that all of the plates involved had been subjected to a process known as "tipping," which, he said, consisted of brushing the leather side of the skins with a solution or preparation, the constituents of which he was unable to give. While such solution colored the leather side of the skin, the witness was emphatic in saying that nothing had been done to the fur (as distinguished from the leather) by way of dyeing or coloring.

Dyeing, according to this witness, is a different process which involves dipping the entire skin into a vat containing dye, with the result that the fur as well as the leather are both dyed. Because the color of the fur of the plates in question had not been changed it was this witness' opinion that they had not been dyed.

For the defendant, Abraham Schiff, the general manager of a fur dressing and dyeing establishment, who had had 40 years' experience in that line of work, was called to the stand. He first stated that in his opinion exhibit 1 had been "dipped" as distinguished from "dyed."

"Dipping," he said, is a process whereby the entire skin is immersed in a vat containing a solution of color half the strength of that used in dyeing. In his view, both the hair and skin of exhibit 1 had been changed in color.

The witness then identified an article which he termed a natural mole plate. This was admitted in evidence over the objection of plaintiff's counsel as illustrative exhibit A. Comparing the two exhibits, 1 and illustrative A, the witness said that something had been done to exhibit 1 to make it a different shade from the original natural plate.

On cross-examination the witness differentiated between brushing, which process appears to be the same as the process of "tipping" as detailed by plaintiff's witness, and the processes of dipping and dyeing. In response to a question by a member of the court he changed his original view that exhibit 1 had been dipped, and stated that in his opinion exhibit 1 had been brushed, but he further stated that such brushing had caused the ingredient brushed on the said exhibit to penetrate into the fur side and change the color of the fur. We think this latter testimony, which contradicts that of plaintiff's witness, is borne out by an examination of the exhibits. A small clipping of fur from exhibit 1 shows it to possess a uniform blue-gray color, while the color of the fur of illustrative exhibit A is not uniform, being gray flecked with brown.

Witness Schiff's later testimony is somewhat confusing in that he was asked—

R. Q. Isn't it correct, Mr. Witness, that in the fur trade dipping, tipping, and brushing are types of dyeing of furs?

to which he replied, "Certainly." Yet, when he was immediately thereafter asked by plaintiff's counsel on recross-examination—

R. X Q. Despite the last answer that you gave, you do not consider Exhibit 1 to be a dyed plate, is that correct?

he answered, "That is right."

From the testimony of both witnesses, as thus detailed, it will be seen that although the witnesses differed on the question of whether the fur had been changed in color, both were agreed that exhibit 1 had not been dyed. It is clear that this view in each instance was based upon the fact that exhibit 1 had not been immersed into a vat containing dye.

In our view there is no such requirement as to method in the common understanding of the term "to dye." Webster's New International Dictionary defines "dye" as a transitive verb as follows:

1. To stain; to color; to give a new and permanent color to, esp. by impregnating the substance with a coloring agent, as in the use of dyestuff, * * *.

2. To impart (a given color) to a fabric or material by dyeing it; as, to dye a blue over a yellow.

In the work entitled "Fur" by Max Bachrach (Prentice-Hall, 1930) the following is said on page 582 under the caption "Dyeing Methods":

Two typical dyeing methods are employed—top blending, or tipping, and saturation.

In top blending, or tipping, the tips of the guard hairs and sometimes the fur fibers of pale peltries and those that have a reddish cast are lightly brushed or else "feathered" with dyestuffs to make them resemble the darker and more expensive peltries of the same type. Martens, Fishers, and Mink are outstanding examples of this type of peltries.

In the saturation method, either the entire skin is dipped into a vat of dyestuff, *or else the dye is brushed on* in successive coats. [Italics added.]

Finally, in the case of *Tannage Patent Co.* v. *Donallan,* 93 Fed. 811, at p. 817, Judge Colt, of the Circuit Court, said:

Dyeing, technically speaking, and as contrasted with painting, means a saturation or impregnation of the fiber in order to secure fixation of color. As applied to some animal fibers, such as silk or wool, it means a thorough saturation; as applied to skins, it may signify a thorough or a partial saturation; in other words, skins may be dyed on the surface, or a portion of the way through, or all the way through. The dyeing of skins is effected either by plunging or dipping in the dyeing solution, *or by spreading the dyeing material on the surface by brushing over it.* [Italics added.]

The ultimate fact to be established in the case at bar is whether or not the furs or plates in issue have been dyed within the meaning of that term as used in paragraph 1519 (b), *supra.* Presumptively, in the absence of proof to the contrary, the common and commercial meanings of that term are the same. The term "dyed" is a participial adjective derived from the verb "to dye." From the foregoing it will be seen that, as commonly understood, the term "to dye," which refers to the act which creates a dyed material, is not necessarily limited to immersion of the material into a vat of dye. It may well be that, as of the effective date of the existing tariff, in the fur industry of the United States and as applied to furs, the term "dyed" had a meaning different from its common meaning and was limited to such furs as had been dyed by immersion in a vat, but we do not think that the present record can be said to have established those facts in accordance with the well-settled rules governing proof of commercial designation.

We are appreciative of the fact that the two witnesses who testified in the case at bar are men of long experience in the fur industry. It is, however, well settled that the common meaning of words is a question of law for the court to determine. Both witnesses clearly stated the basis for their testimony that the plates in issue were not dyed, which is in conflict with the understanding of the court and with the authorities which the court has referred to as aids in determining the common meaning of the term.

On the record presented, the protests are overruled, and judgment will issue accordingly.